[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff is a partnership of certified public accountants. The defendant is a certified public accountant and former partner in that partnership. This law suit arises from the termination of the defendant as partner. The complaint is in three counts. In the First Count, the plaintiff alleges that the defendant voluntarily withdrew from the partnership on August 8, 1986, and then breached the provisions of the written partnership agreement (the Agreement) with respect to the solicitation and servicing of plaintiff's clients. In the Second Count, the plaintiff alleges that the defendant wrongfully procured an advance of $1,200 from the plaintiff immediately prior to his withdrawal from the firm. In the Third Count, the plaintiff alleges that the defendant violated the partnership agreement by "serious misconduct or willful inattention to the affairs of the partnership" and that, therefore, the plaintiff expelled him from the partnership on September 25, 1986. In the prayer for relief, the plaintiff seeks damages and equitable remedies.
Pertinent provisions of the Agreement are as follows:
5. Withdrawal:
 (a) Any partner shall have the right to withdraw voluntarily from the partnership as of the close of any calendar quarter by serving written notice of his intention so to withdraw. Such notice shall be served at least ninety (90) days prior to the effective date of such withdrawal . . . .
 (b) In the event of such withdrawal, the books of the partnership shall be closed as of the date contained in said notice, in the same manner and methods used by the partnership in the ordinary course of its business at the end of a fiscal year . . . .
 (c) . . . During said notice period, the withdrawing partner shall, at the option of the remaining partners, continue to devote the same efforts and time to the partnership affairs as he did prior to the date of the giving of notice . . . .
 (e) A withdrawing partner shall not directly or in directly, individually or as an employee or a member of any other firm, partnership or corporation, render services to any client within the State of Connecticut which CT Page 4869 this partnership has served at any time during the five (5) year period prior to his withdrawal or is servicing at the date of his withdrawal, for a period of two (2) years from the date of his withdrawal, nor shall the withdrawing partner, directly or indirectly, solicit or cause to be solicited, any such client of the partnership, for a like period, except as provided in 5(f).
 (f) Only clients obtained solely by a partner either before admittance to or during his membership in the partnership, may be withdrawn by such partner upon his withdrawal from the partnership. In the event of such withdrawal, in each of the ensuing three (3) years, he shall pay to the partnership forty (40) percent of his gross charges collected from any clients so withdrawn. If such clients withdrawn by the withdrawing partner produce gross fees equal to or more than twenty (20) percent of the total gross fees of the partnership during the year preceding his withdrawal, in each of the six (6) years following his withdrawal from the partnership, he shall pay to the partnership forty (40) percent of his gross charges collected from such clients.
6. Expulsion:
 (a) In the event that any partner shall materially violate any of the terms of this Agreement, or by serious misconduct or willful inattention to the affairs of the partnership, cause substantial injury to the partnership, the other partners, by unanimous vote may expel such partner from the partnership, notice of which vote shall be given in writing, by registered mail, served at the offices of the partnership and a copy thereof at such partner's last known address as appears on the books of the partnership. The participation of such expelled partner in the profits of the partnership shall cease one (1) week after the mailing of the notice.
 (b) Any loss (as reasonably determined by the other partners) resulting from acts or omissions described in 6(a) shall be charged against the capital account of the expelled partner. The amount payable to him shall then be calculated and paid in the same manner as in the case of a voluntary withdrawal, as set forth in 5(b) and (c).
 (c) If the right of a partner to practice public accounting is suspended or revoked, that partner shall be deemed to have been expelled from the partnership as of the date of such suspension or revocation, but CT Page 4870 only for the period of such suspension or revocation.
 (d) The same restrictions and procedures applying to a partner who withdraws voluntarily, as set forth in Section 5(c) through (f), shall apply to an expelled partner.
 (e) The expulsion of any partner or partners shall not terminate the partnership.
On May 5, 1987, this court (D. Dorsey, J.) made findings of fact and issued orders with respect to requested injunctive action. Accordingly, certain issues raised by the complaint are res judicata. Thus the court found that the defendant had not violated the Agreement by soliciting existing clients of the plaintiff up to the date of the decision. It found, however, that the defendant had removed files and documents pertaining to such clients and that he had provided accounting services to such clients, after he left the partnership, when they came to him unsolicited. The court further found that the plaintiff had not violated its Agreement with the defendant so as to excuse him from the consequences of any breach on his part. Finally, the court expressly did not decide whether the defendant voluntarily withdrew or was expelled by the plaintiff.
All of the time limitations with respect to competition in the partnership agreement have expired. The defendant has returned all of the plaintiff's files and documents. The plaintiff's claims for injunctive and other equitable relief are, therefore, moot. The plaintiff's claims for money damages for breach of the partnership agreement remain for decision by this court. The court's findings of fact are based on evidence adduced at the trial and stipulations of the parties.
The defendant began as an employee of the plaintiff in 1973. On December 31, 1981, he and the plaintiff entered into a partnership agreement (the Agreement), to take effect on April 1, 1982. Thereafter, the defendant worked as a partner until 1986. His work consisted of providing accounting services to clients of the plaintiff, who may be conveniently divided into two categories. The first category consists of clients of the plaintiff which were not obtained by the defendant, designated in the Agreement in Section 5(e). The second category consists of clients of the plaintiff which were obtained solely by the defendant, designated in the Agreement in Section 5(f).
During the early summer of 1986, the defendant became increasingly dissatisfied with the partnership relationship, including the work assigned to him and his compensation. On or about June 3, 1986, he decided to resign. At about the same CT Page 4871 time, he engaged in discussions with some of the clients he had been servicing, both 5(e) and 5(f) clients, about his termination and the possibility of his continuing to provide accounting services to them after he left the partnership. He also had discussions with some employees of the partnership about joining him in his own firm after he left the partnership. One of them, Kevin Kelleher, agreed that he would join the defendant as his partner after the defendant left the plaintiff. No other employee of the plaintiff followed the defendant. Sometime in early July, the defendant testified, he "got cold feet" about his decision to leave. As an alternative, he proposed to the plaintiff that he resign as a partner but continue on as an employee of the firm. This was the first time that the plaintiff knew that the defendant was contemplating withdrawing from the firm. The plaintiff rejected the defendant's proposal, and from that point on, the die was cast. On July 23, 1986, the defendant and Kelleher signed a lease for the office space they would be using in the new partnership. The landlord was a member of the Giardini family, whose various businesses had been important, longstanding clients of the plaintiff. During this time, the defendant copied the plaintiff's records pertaining to certain clients. The defendant had still not communicated his decision to the partnership.
On August 8, 1986, the defendant initiated his termination from the partnership. In the morning, using partnership credit cards, he filled the gas tanks of his own and his wife's cars. He also obtained a draw (an advance against his share of the profits) in the amount of $1,200. In the afternoon of August 8, he delivered to one of his partners a letter stating "I hereby resign, effective immediately, as a partner in the firm of Spitz, Sullivan, Wachtel Falcetta." Copies were also furnished to the other partners in accordance with the Agreement.
The plaintiff responded to the defendant's letter in various ways. Frank Sullivan, the partner to whom the letter was delivered, testified that he accepted the defendant's office keys and company credit cards at the same time. He said that at that point he no longer considered the defendant a partner. Stuart Wachtel, another partner, testified somewhat ambivalently on the question whether the defendant's termination took effect immediately. He did testify, however, that the plaintiff took a number of actions that signified that the defendant was no longer a partner after August 8. Thus, he said that after August 8:
1. The plaintiff prohibited the defendant from drawing against distribution of profits, although other partners CT Page 4872 received regular draws throughout August and September;
2. The plaintiff deleted the defendant from its group life insurance policies, effective August 8, 1986;
3. The plaintiff terminated the defendant's disability insurance coverage, effective August 8;
4. The plaintiff immediately removed the defendant's name from its letterhead;
5. The plaintiff gave no notice to the defendant of the partners' meeting scheduled for September 25, 1986.
6. The plaintiff's senior partner, Samuel A. Spitz, wrote the defendant on August 26, 1986, stating that the partnership books would be closed as of August 8 so as to accomplish a final accounting with the defendant. He also referred to the same date for final billing to any 5(f) clients whom the defendant might wish to continue servicing.
7. On September 2, 1986, the plaintiff's attorney wrote to the defendant to warn him against violating the provisions of 5 (e) of the Agreement, relating to "a withdrawing partner." That letter begins "This office represents the accounting partnership of `SSWF' of which you were a partner until your recent withdrawal." (Emphasis added).
8. On September 23, 1986, the plaintiff filed the original complaint in this action in this court. It was dated September 11, 1986. At that time, the plaintiff claimed only that the defendant "voluntarily withdrew from participation as a partner in SSWF." The plaintiff did not claim at that point that it had expelled the defendant pursuant to Section 6 of the Agreement.
9. The plaintiff never took any vote of the partners with respect to the defendant's withdrawal and, specifically, never told the defendant that it rejected his expressed wish that his withdrawal take effect immediately; that is, on August 8.
On September 25, 1986, without notice to the defendant, the partners met and after discussion, including a report of advice from their attorney, they voted unanimously to expel the defendant pursuant to Section 6 of the Agreement. The plaintiff's counsel wrote the defendant on October 2, 1986, informing him of that action.
The first issue presented by the foregoing facts is whether the defendant terminated his relationship with the plaintiff by CT Page 4873 voluntarily withdrawing on August 8, 1986, or whether the plaintiff expelled him from the partnership on September 25. The significance of this issue is that Section 6 of the Agreement provides the plaintiff an opportunity to enhance its damages unilaterally by adding "(a)ny loss (as reasonably determined by the other partners) resulting from acts or omissions described in 6(a) . . ." Such acts or omissions are (1) material violations of the Agreement and/or "(2) serious misconduct or willful inattention to the affairs of the partnership." The plaintiff, in the Third Count, is claiming as damages under this provision consequential losses arising from the defendant's termination, such as attorney's fees, expenses incurred in replacing Kevin Kelleher, and punitive damages.
The plaintiff's argument is two-pronged. First, it argues that the issue was implicitly decided, and is thus "law of the case," in this court's decision (M. Hennessey, J.), dated March 14, 1988, denying defendant's motion to strike the Third Count. That decision, however, merely held that the plaintiff had stated facts sufficient to establish a cause of action for misappropriation of partnership funds. It did not specifically address the factual question of whether the defendant quit or was fired. Furthermore, this court's task is to resolve all important questions of fact and law and it is not necessarily bound by previous rulings. Breen v. Phelps, 186 Conn. 86, 99
(1982). The court holds that the decision on the motion to strike is not dispositive of the factual questions concerning the defendant's termination and the applicability of the various provisions of the Agreement to those facts.
During the trial, counsel and partners of the plaintiff argued that the defendant's withdrawal was not effective on August 8, 1986, and that he was, therefore, still a partner when the firm acted to expel him on September 25. They base this argument on Section 5 of the Agreement, which provides that any such withdrawal takes effect at the close of a calendar quarter and after ninety days notice. According to this provision, the plaintiff claims, the defendant's notice of withdrawal on August 8 could not take effect immediately. Indeed, a strict application of that provision would defer the effective date to December 31, 1986. The plaintiff's own actions, however, do not support such an interpretation of the actual agreement between the parties. Immediately, upon receipt of the defendant's letter of August 8, the partnership treated him as though he had terminated on that date. All of the plaintiff's actions, as set forth above, are consistent with immediate termination and inconsistent with the notice provisions of Section 5 of the Agreement. Furthermore, there was no evidence that the plaintiff was forced to adopt this posture. Indeed, the plaintiff would have been justified in taking the position that CT Page 4874 the notice provisions controlled the effective date of withdrawal regardless of the defendant's wishes. As written, the Agreement provides the remaining partners an opportunity to hold a withdrawing partner strictly to the notice provisions and, if they have grounds, to expel him prior to the effective date of his withdrawal. As indicated, however, there is no evidence that the plaintiff intended to adhere to the Agreement in that regard. "Whether the parties have manifested an intention to modify or abandon their agreement is ordinarily a question of fact." The "relevant intent" is to be inferred "from the attendant circumstances and conduct of the parties." Rowe v. Cormier, 189 Conn. 371, 372-373 (1983). Based on all of the circumstances and the conduct of the parties, especially during the period August 8, 1986, to September 25, 1986, the court finds that the parties intended that the Agreement be modified so as to effectuate the defendant's withdrawal as a partner immediately on August 8, 1986. The plaintiff's subsequent action in voting to expel him on September 25, 1986, therefore, was a nullity. It follows that the plaintiff's claim in the Third Count for damages under Section 6 of the Agreement cannot be sustained.
In the Second Count, the plaintiff claims damages for advance withdrawals in excess of his share of the profits. With respect to this claim, the evidence is not in dispute; indeed, the defendant admitted to owing a specific sum as his "negative capital account" during the course of the trial. This capital account includes the undisputed $1200 advance made on August 8, 1986, as well as insurance premiums, car payments, gasoline charges, and other expenses and advances made to or in behalf of the defendant on and before August 8, 1986. The court finds that the total is $6,733 as of August 8, 1986. It is a negative balance. The defendant has not remitted that amount to the plaintiff. The time for payment has long since expired, and it is now due and owing. The court finds, therefore, that the amount of damages for which the defendant is liable under the Second Count is $6,733.
In the First Count, the plaintiff claims damages under Section 5(e) and 5(f) of the Agreement. Section 5(e) pertains to clients of the plaintiff during the five year period prior to the defendant's withdrawal, other than clients whom the defendant had personally obtained for the firm. The Agreement prohibits the defendant from soliciting accounting business or performing accounting services or any of those clients for two years after his withdrawal. Section 5(f) provides that the defendant may take with him any clients that he had personally obtained for the firm during his tenure, but it obligates him to pay the plaintiff forty percent of "his gross charges collected from (those) clients" for three years after withdrawal. The CT Page 4875 defendant testified that he fully understood the effect of these provisions when he entered into the contract and that he knew their purpose was to protect the firm in conducting a business in which partners develop close relationships with the firm's clients. Nevertheless, he argues that the provisions of these sections unlawfully restrict his pursuit of his profession and are, therefore, unenforceable. The court disagrees.
In Robert S. Weiss Associates v. Wiederlight, 208 Conn. 525
(1988); and New Haven Tobacco Co. v. Perrelli, 11 Conn. App. 636
(1987); the courts have set forth criteria relevant to an evaluation of covenants not to compete which are ancillary to employment agreements. The five factors to be considered in determining whether such a covenant is reasonable and, therefore, enforceable are: (1) the length of time the restriction is operative; (2) the extent of the geographical area covered; (3) the fairness of the protection afforded the employer; (4) the extent of the restraint on the employee; (5) the extent of the interference with the public interest. Robert S. Weiss Associates v. Wiederlight, supra, 529 (n. 2). Applying these criteria to the facts of the instant case, the court concludes that the provisions of Section 5(e) are not unreasonable. With respect to the durational and geographical limitations, the covenants are typical of those that have been sustained by the courts. Id. 529-530. In particular, the geographical limitation is implicitly confined to the State of Connecticut and primarily the greater Hartford area, since that is where most of the plaintiff's clients are located. With respect to the relative extent of the protection afforded the employer versus the restriction on the employee, the provisions of this Agreement are notably less harsh on the employee than many such covenants, which typically ban all competitive activity within the time and geographical limits. Here, the Agreement merely prohibits the defendant from providing services to already existing clients of the plaintiff. It leaves him completely free to compete with the plaintiff for new business.
The defendant addresses his most serious argument to the public interest factor. In New Haven Tobacco Co. v. Perrelli, supra, the appellate court held that the three criteria to be considered in determining whether the covenant unreasonably interferes with the public are: (1) the extent of the effect on the public; (2) the likelihood that the covenant will create or maintain a monopoly; and (3) the extent of the interest protected by the covenant. With respect to the extent of the effect on the public, the Agreement is limited to those members of the public who were clients of the plaintiff. It does not affect the public at large. Moreover, the effect of the covenant is limited to a two year period. As a practical matter, the evidence in the case indicated that there were CT Page 4876 approximately fifty-seven clients of the plaintiff who were subsequently serviced by the defendant, but many of these were related entities so that the actual number was less than fifty. This was a small fraction of the plaintiff's total client portfolio. The defendant cites two cases to support his argument that Section 5(e) of the Agreement unreasonably interferes with the public interest. Of these, Smith, Batchelder Rugg v. Foster, 406 A.2d 1310 (Sup.Ct., N.H., 1979); found a similar agreement to be unenforceable, but on the ground that it was unreasonable in view of the greatly disproportionate financial strength of the employer compared to the employee. The decision of the Georgia Supreme Court in Singer v. Habif, Arogeti Wynne, P.C., 297 S.E.2d 473 (1982) directly supports the defendant's position in that it finds that a similar agreement "unreasonably impacts on the employee and the public's ability to choose the professional services it prefers." However, the court's decision was primarily based on its conclusion that the agreement "over protects" the employer as compared to the employee. The defendant has cited no Connecticut precedent which renders such an agreement unenforceable merely because it prohibits a defecting professional employee from servicing unsolicited clients of his former employee. And the New Haven Tobacco Co. case, supra, upheld the enforceability of an anti-servicing clause relating to nonprofessional work. Finally, the evidence in the instant case was that clients of the plaintiff and the defendant frequently shifted their business to other accounting firms as their own needs dictated. This court does not find on the evidence, any unreasonable restriction on the public's ability to obtain professional accounting services.
With respect to the second criteria, there was no evidence whatsoever that enforcement of the covenant would create a monopoly, and it is obvious to the court that it would not.
Finally, the plaintiff had a legitimate, legally protected interest in protecting its business. "When the character of the business and the nature of the employment are such that the employee requires protection for his established business against competitive activities by one who has become familiar with it through employment therein, restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights . . . . Especially if the employment involves . . . [the employee's] contacts and associations with clients and customers it is appropriate to restrain the use, when the service is ended, of the knowledge and acquaintance, so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge." Robert S. Weiss Associates v. Wiederlight, supra, 533. In the present case, there was abundant undisputed evidence that the CT Page 4877 defendant's position as a partner in the plaintiff's firm involved substantial and frequent contact and association with the plaintiff's clients. The court concludes that the two year prohibition on the defendant's servicing of these clients after leaving the plaintiff was not an unreasonable interference with the public interest. For all of the reasons set forth above, the court further concludes that Section 5(e) of the Agreement is not an unreasonable restriction on the defendant and is, therefore, enforceable against him.
The plaintiff offered considerable evidence in an effort to prove that the defendant's breach of Section 5(e) of the Agreement resulted in compensable losses. With respect to the amount of the claimed losses, the plaintiff produced evidence showing that the amount of its billings to the Section 5(e) clients who followed the defendant when he left was $118,192 for the fiscal year immediately preceding the defendant's withdrawal. Evidence was also introduced showing that bills rendered by the defendant to such clients during the two calendar years after he left the plaintiff amounted to approximately $247,000. The plaintiff also produced an expert witness, Benjamin E. Cohen, a certified public accountant, who testified that the value of the Section 5(e) clients in question is $149,876.40. He stated that he arrived at that figure by applying factors approved by a committee of the American Institute of Certified Public Accountants to actual billing records of those clients. He stated that he had not interviewed any of the Section 5(e) clients who left to ascertain their long-term loyalty to the plaintiff or the defendant, nor did he analyze any other individual details about these clients or their records while they were serviced by the plaintiff. In essence, he applied a formula to a billing list of clients to arrive at a monetary figure. In opposition, the defendant's expert, Alvin J. Hirschfeld, also a certified public accountant, testified that in his opinion Cohen's method of evaluating the client list was inappropriate in this case because it did not include an adequate assessment of client loyalty. He stated that Cohen's method might be appropriate for evaluating a client list in connection with the sale or takeover of an accountant's entire practice but that an evaluation of clients who defect requires personal interviews with them to determine their inherent loyalty.
A number of witnesses appeared for the defendant, and their testimony considerably substantiated the opinion of the defendant's expert and undermined Cohen's opinion. Seven different Section 5(e) clients of the plaintiff who followed the defendant when he left the firm testified that they had become dissatisfied with the plaintiff's services and would have gone elsewhere even if the defendant had not been available to CT Page 4878 service their accounts. In addition to this testimony, there was also evidence that some of the defecting 5(e) clients left the defendant after using him for only a few months. The only evidence that any 5(e) client might have remained with the plaintiff and was thus of some reliable value to the plaintiff was the testimony of Thomas Giardini. He is the owner or effectively in control of a number of companies which, in the aggregate, comprise a large and significant block of 5(e) client business. He testified that he initially gave some of his business to the defendant after he left the firm at the defendant's urging and in return for the defendant renting space in a Giardini building. The defendant flatly denied those assertions. Furthermore, Giardini, on cross examination, admitted that he and the defendant are presently suing each other in a separate law suit and that the relationship is unfriendly. Significantly, when that relationship turned sour, Giardini took his business elsewhere and did not return to the plaintiff. He testified that he felt no loyalty to the plaintiff. The court find Giardini's testimony not credible as it relates to the transfer of his business to the defendant.
The reason why the evidence described above concerning the clients' lack of loyalty to the plaintiff is significant is that such loyalty was considered by both expert witnesses to be a significant factor in assessing the value of the clients as a measure of the plaintiff's damages. This evidence, therefore, tended to discredit the opinion of the plaintiff's expert.
The evidence discussed above casts significant doubt not only on the measure of damages claimed by the plaintiff but also on the plaintiff's allegation that its losses were caused by the defendant's breach of Section 5(e). "(L)ost profits cannot be recovered unless it is reasonably certain that they resulted from the breach." Robert S. Weiss Associates v. Wiederlight,190 Conn. 351, 369 (1983). In the present case, all of the available evidence suggests that the plaintiff's hold on the 5(e) clients who departed was tenuous at best and, in some cases, was nonexistent. Under these circumstances, it is impossible for the court to conclude that the plaintiff's losses were as great as opined by its expert witness or that they were caused by the defendant's willingness to service them in breach of the Agreement. Therefore, for all of the reasons set forth above, the court concludes that the plaintiff has not sustained its burden of proving the amount of its damages or that its losses were caused by the defendant's breach of Section 5(e). Accordingly, the court awards no damages on that account.
The factors supporting the enforceability of Section 5(e) apply with equal force to Section 5(f), and the court concludes that it is likewise enforceable. The case is different with CT Page 4879 respect to the plaintiff's claim for damages under Section 5(f), however. There is essentially no dispute that the amount produced by the formula in that section of the agreement — 40% of the gross fees collected by the defendant from the 5(f) clients over the three year period — is $11,032.80. The sum is, therefore, in the nature of liquidated damages, agreed upon in advance. The defendant, however, seeks to avoid such damages on the basis that the formula is punitive and confiscatory in view of the expenses he incurred in servicing those clients. The defendant testified that his expense ratio on fees collected after leaving the plaintiff were in excess of 60% during all of the period covered by Section 5(f). Therefore, he claims, he would lose money on these clients if he were obligated to pay the plaintiff the additional 40%.
The defendant's position is fatally weak in two areas. First, the defendant admitted on cross examination that his expense ratios, if calculated by the method used by the plaintiff to calculate such ratios, would be less than 50% for the years in question. Such an admission, while not totally dispelling his evidence of 60% ratios, nevertheless, weakens his argument that the formula he agreed to in the partnership Agreement is "Draconian." Much more important in the court's view, however, is that the defendant agreed to the specific formula and clearly understood the potential effect of it. At the time he signed the Agreement, he had been working for the plaintiff as an accountant for more than eight years and had been a certified public accountant for four of those years. He was obviously especially capable of evaluating a contract such as this one, including the effect of predictable expense ratios. "The final consideration which must be taken into account is the public interest in requiring those who have freely entered into an agreement, and who have received a benefit for doing so, to abide by the terms of the agreement. The principle that agreements contrary to public policy are void should be applied with caution and only in cases plainly within the reasons on which that doctrine rests; and it is the general rule . . . that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." New Haven Tobacco v. Perelli, supra. 643, citing Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353 (1931).
The court finds that Section 5(f) is not unreasonable unduly punitive as applied to the defendant under all of the circumstances of this case. Accordingly, the plaintiff is entitled to recover damages as provided therein.
To summarize, judgment may enter in favor of the plaintiff on the First Count in the amount $11,032.80 and on the Second CT Page 4880 Count in the amount of $6,733.00, for a total of $17,765.80, plus costs. Judgment may enter in favor of the defendant on the Third Count.
MALONEY, J.